Carl R.T. KEYSER, Jr., Appellant,

v.

STATE of Alaska, Appellee.

No. A–4468.

Court of Appeals of Alaska.

July 30, 1993.

**5.** These holdings make it unnecessary to address any of the remaining points advanced by the parties.

Mary P. Treiber, Asst. Public Defender, Ketchikan, and John B. Salemi, Public Defender, Anchorage, for appellant.

Adrienne P. Bachman, Asst. Dist. Atty., Ketchikan, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## *OPINION*

BRYNER, Chief Judge.

In 1989, Carl R.T. Keyser, Jr., entered a plea of no contest to a charge of first-degree theft in violation of AS 11.46.120 (theft by deception of property valued at $25,000 or more). The offense is a class B felony, carrying a maximum term of ten years. AS 11.46.120(b); AS 12.55.125(d). Presumptive terms for second and subsequent felony offenders are four and six years. AS 12.55.125(d)(1)–(2). Keyser was a first felony offender and was not subject to a presumptive term. In accordance with a plea agreement between Keyser and the state, Superior Court Judge Thomas E. Schulz suspended the imposition of Keyser's sentence on condition that Keyser serve ninety days in jail, pay restitution of $17,354.67, and complete a seven-year period of probation.

Keyser completed his jail term and was released on probation in May of 1989. In February of 1991, the state petitioned to revoke Keyser's probation. Over the next year the state filed several supplemental petitions. Ultimately, Keyser admitted the allegations of an amended and consolidated petition dated February 18, 1992. Following an evidentiary hearing, Judge Schulz revoked probation, rescinded the suspended imposition of sentence, and sentenced Keyser to a maximum term of ten years. Keyser appeals, contending that the sentence is excessive. We reverse.

## KEYSER'S ORIGINAL OFFENSE

In 1988, Keyser, relying on a fraudulent employment application, secured employment as the city manager for the village of Kake at an annual salary of $44,000. After Keyser had spent approximately two months in the position, Alaska State Troopers arrested him on a warrant from Kentucky, where he had been charged with theft by deception for obtaining $697 in connection with his fraudulent application for a position as city manager for the town of Pikesville. Keyser's arrest on the Kentucky warrant led to the discovery that his application for the city manager position in Kake contained numerous false statements concerning his background and qualifications. By that time, Keyser had received a total of about $28,680 in moving costs, living expenses, salary, and other benefits from the village of Kake. As a result, he was charged with first-degree theft.

## THE ORIGINAL PROCEEDINGS

### 1. *The Plea Agreement*

Keyser eventually entered into a plea bargain with the state, pursuant to which he would receive a seven-year suspended imposition of sentence in return for his plea of no contest. Under the terms of the bargain, the court would order Kaiser to pay restitution to the village of Kake and to the city of Pikesville, Kentucky, to write letters of apology to both cities, and to serve a seven-year period of probation. The parties apparently contemplated that, after sentencing, Keyser would move to Seattle, Washington, where he would begin

his probationary term. According to the agreement, Keyser would be prohibited from securing any government employment with the exception of regular military service while on probation.[1]

### 2. *The Original Presentence Report*

Before the superior court finally accepted Keyser's negotiated no contest plea, it ordered a presentence report prepared. The report indicated that at the time of this offense, Keyser was thirty-four years old and was married, with four children. He had no prior felony convictions but had been convicted in 1987 of a misdemeanor perjury charge in Florida, for which he received one year of probation. In addition, in 1978, Keyser was convicted in Utah on a misdemeanor charge of issuing bad checks; he received a suspended imposition of sentence, and the conviction was later expunged from his record. The report revealed nothing about the circumstances surrounding the Florida or Utah misdemeanor convictions.

According to the presentence report, Keyser had served in the army for five years, receiving an honorable discharge as a first lieutenant in 1978. After that, Keyser's employment history consisted of sporadic jobs in various small towns, initially as a police officer or as police chief, but more recently as a city manager or administrator. Keyser's presentence report questioned his qualifications for such work, however, noting that, although Keyser claimed to have made substantial progress toward a college degree in public administration at a correspondence school in Illinois, the school was apparently unaccredited and had recently been closed, so Keyser's claim could not be verified; in addition, although Keyser had evidently participated in several months of police training in California, he had never been certified to work as a police officer.

Based on his investigation, the author of the presentence report recommended against the court's acceptance of the plea agreement. Although noting that Keyser "is an intelligent, personable individual" and that "[h]e has been described as a sincere family man, who cares about his wife and children, and values their presence in his life," the author emphasized the serious nature of Keyser's offense, pointing out that Keyser was not a youthful offender, that he had been misrepresenting his qualifications to employers for at least three years, and that, by his own admission, he needed psychological counseling to address his problems. Given these factors, the author of the report believed a suspended imposition of sentence to be inappropriate and found no reason to treat Keyser differently than other offenders convicted of first-degree theft.

More specifically, the report's author sounded the following, prophetic warning against a suspended imposition of sentence that would restrict Keyser from government jobs and place him on probation in Seattle:

> Mr. Keyser is going to have to obtain employment and pay back a sizeable amount of restitution. He is also responsible for the financial support of his wife and four young daughters. I do not believe it is appropriate to require Mr. Keyser to avoid all government jobs, but do believe it is appropriate to assure that he is both qualified and able to perform the duties of whatever job he does obtain. That can be done while he is on supervised probation by requiring him to report to his probation officer for approval of jobs before he accepts them. Mr. Keyser has a track record of being "found out" in communities where he has talked himself into employment that he is not qualified for, and then leaving town, sometimes travelling clear across the country. Without measures being taken to correct that behavior, Mr. Keyser is likely to reoffend. However, by requiring him to remain in a community where he can be supervised by a probation officer, confer with his probation

---

**1.** Keyser paid the restitution to Pikesville before his sentencing hearing in the present case, and the Kentucky case was apparently dismissed.

officer prior to accepting any employment position, and requiring that he participate in psychological counseling and furthering his employment eligibility through education and training, the predicament that Mr. Keyser finds himself in at this time need never reoccur.

The [Criminal] Rule 11 [plea] [a]greement requires that Mr. Keyser not be employed in any government jobs, and that he be supervised for seven years. This probation officer prefers that those conditions not be applied for the following reasons: The biggest employer in the State of Alaska is the government ...; if Mr. Keyser cannot be employed by a government agency, his best chances for employment are in Seattle; the probation officer monitors a probationer's employment; the State of Washington supervises probationers for one (1) year, and in many cases only require[s] them to report by mail; I do not believe Mr. Keyser can maintain his "good intentions" for seven years unless closely supervised, which he won't be in Seattle.

### 3. *The Original Sentencing Hearing*

Despite this note of caution, Judge Schulz accepted the plea agreement and suspended the imposition of Keyser's sentence in accordance with its terms. Upon completing his ninety-day jail term, Keyser moved to the Seattle area; supervision of his probation was transferred to the state of Washington, which placed Keyser on a mail-in reporting system.

### KEYSER'S CONDUCT ON PROBATION

Over the ensuing two years, Keyser used fraudulent job applications and false documents—including forged military discharge papers and social security cards issued under various aliases—to secure a number of jobs managing apartment complexes in the Seattle area. Within a short time of beginning each job, Keyser was fired due to incompetence or mismanagement. In one instance, he misappropriated approximately $2,500 from an employer's trust account before being fired. He repaid the money only after being threatened with prosecution. In other instances, he submitted W-4 forms with false information to employers—evidently in violation of federal law.

During the same period, Keyser submitted several false loan applications to Seattle area banks to obtain cash or to finance various purchases, later defaulting on the loans. Keyser negotiated, or attempted to negotiate, numerous bad checks on bank accounts that either had insufficient funds or had been closed. He also purchased various items with invalid credit cards. Through all of his fraudulent transactions, Keyser secured property or funds amounting to at least $30,000 in value.

As time went on, Keyser's false claims appeared to become increasingly grandiose, almost gratuitously so. For example, prior to his sentencing in Alaska, Keyser reported to the author of his presentence report that he had served in the Army for five years and had been honorably discharged as a first lieutenant (a claim that was later found untrue). In a resume Keyser submitted for an apartment managers' position in the Seattle area after being released on probation, however, he claimed to have graduated from West Point and to have completed fifteen years of military service before retiring from the Army in 1988 as a major; he further claimed that his last military assignment had involved the management of twenty-two hundred military rental units at Fort Benning, Georgia. In an even later application to another prospective employer, Keyser made similar false claims, but gave himself a promotion to the rank of lieutenant colonel.

Keyser's probation violations came to a head in early 1991. In January of 1991, Keyser became angry with a neighbor. Keyser armed himself with a pistol, entered the neighbor's apartment, and threatened to shoot the neighbor and two other persons who were present. Washington police arrested Keyser on felony assault charges as a result of the incident. The arrest evidently prompted Washington probation officials to look more closely into Keyser's situation; as they did so, they progressively became aware of the scope of his fraudulent misdealing. This launched

the filing of a series of probation revocation petitions in Alaska, which, in turn, led to Keyser's extradition from Washington. The Washington charges were eventually dropped in light of Keyser's impending extradition to Alaska.

### PROBATION REVOCATION PROCEEDINGS

#### 1. *The Probation Revocation Charges*

Once returned to Alaska, Keyser admitted the allegations of a petition charging him with violating the conditions of his probation by possessing a concealable firearm, passing several thousand dollars in bad checks, filling out false applications for employment and false W-4 forms, and using false information to obtain loans from various lending institutions. He also admitted failing to pay any restitution to the village of Kake during his two years of probation.

#### 2. *The Updated Presentence Report*

In an updated presentence report prepared for Keyser's disposition hearing, his probation officer expressed the view that Keyser could no longer be considered a viable candidate for probation and appeared to be incorrigible. The updated report revealed additional information about Keyser's background that had not been known at the time of his original sentencing hearing.

For example, the updated report established that Keyser had actually served only a year or two in the military and had been discharged at the rank of private. Moreover, whereas the original presentence report indicated that Keyser's pattern of fraudulent employment applications for city manager positions dated back approximately three years, the updated report established a far lengthier series of deceptive applications relating to his earlier police jobs.

Specifically, the updated report attached (without objection from Keyser) an article published in a Seattle newspaper after Keyser's arrest in Washington. The article reported that, between 1980 and 1987, Keyser had relied on false information to obtain a series of thirteen jobs as a police officer or chief in various small towns across the country. In all instances, Keyser's misrepresentations were discovered soon after he was hired, and he was either fired or forced to resign. According to the article, most of the communities that employed Keyser were willing to give him favorable recommendations for other jobs in return for his agreement to leave quietly.

The exception was Oak Hill, Florida, where Keyser served as police chief for four months in 1987—his last police job. When Keyser's misrepresentations were discovered in Oak Hill, a misdemeanor perjury charge was filed against him; he was convicted, was given a one-year period of probation, and was forbidden from seeking any further employment in law enforcement. This evidently prompted Keyser to refocus his efforts on city manager positions thereafter.

In addition to revealing the foregoing new information, the updated presentence report also attached a psychological evaluation recently prepared by Dr. Lynn Caldwell of Ketchikan. Caldwell reported that Keyser appeared to be "cooperative and well motivated" and that he was of above average intelligence. Based on a test of Keyser's personality profile, Caldwell found "no indication ... of psychotic process or poor reality testing," but did discover indications of "lifelong adjustment problems related to personality and behavior disorders."

Caldwell noted, specifically, that individuals with test results similar to Keyser's tended to be profoundly suspicious of others, to be unable to accept responsibility, and to transfer blame as a defense; such individuals are also characteristically short-tempered and impulsive, self-centered and demanding, and use somatic complaints to gain control and sympathy. Caldwell further observed that Keyser appeared to be mildly depressed.

According to Caldwell, these traits indicated that Keyser's problems were "not

likely to respond to insight oriented individual psychotherapy." Caldwell believed that, instead, Keyser was "most likely to benefit from close supervision and long term direct monitoring of his behavior and activities in progressively diminishing direct management." In Caldwell's view, "[v]ocational training for specific occupational skills may be helpful in achieving" the goals of such treatment.

### 3. *The Disposition Hearing*

At Keyser's disposition hearing, the state presented several witnesses to confirm that Keyser's actual conduct conformed to the personality traits addressed in Dr. Caldwell's psychological evaluation. Based on this evidence, the state argued that Keyser was a "pathological liar" and a danger to the community. The state urged the court to impose a sentence exceeding the four-year presumptive term for a second, class B felony offender, the term that would ordinarily be the appropriate sentencing limit for a first-offense class B felony like Keyser's. *See Austin v. State*, 627 P.2d 657, 657–58 (Alaska App.1981). The state further argued that, in light of Keyser's conduct on probation, the court should consider finding him to be a worse offender—a finding that would justify the imposition of a maximum, ten-year term. *See State v. Wortham*, 537 P.2d 1117, 1120 (Alaska 1975).

After considering the evidence, Judge Schulz agreed with the state's argument. Although Judge Schulz expressly found that the offense for which Keyser stood convicted "doesn't measure up to a worst offense," the judge concluded that Keyser's "record on probation leaves the court with no choice ... but to find that Mr. Keyser is a worst offender."

Addressing the sentencing criteria articulated in *State v. Chaney*, 477 P.2d 441, 443–44 (Alaska 1970), Judge Schulz concluded that Keyser's potential for rehabilitation to be as "near to zero as anything I've ever seen." Finding it unreasonable to believe that a probation officer could supervise Keyser adequately, Judge Schulz also expressed the view that a lengthy sentence was necessary to protect the public and that such a sentence would further the goal of community condemnation. Finally, Judge Schulz emphasized that specific deterrence was a particularly important goal in theft cases, stating "the sentence that is imposed today has to speak loudly and clearly on specific deterrence because Mr. Keyser has goofed up so badly on his probation". Accordingly, Judge Schulz sentenced Keyser to the maximum term of ten years.

## DISCUSSION

To resolve the dispute in this case, we must independently review the sentencing record and determine whether the sentence imposed is clearly mistaken:

> Although the primary responsibility for sentencing rests with the trial court, the scope of appellate review requires that we make our own examination of the record, focusing on the need for protecting the public, the nature of the crime, and the defendant's character. This independent examination of the justice of a particular sentence is necessary if the review process is to function effectively. Our standard of review on a sentencing appeal is to determine whether the trial court's imposition of sentence was "clearly mistaken."

*Benefield v. State*, 559 P.2d 91, 97 (Alaska 1977) (footnotes omitted).

We will find a sentence clearly mistaken only when our independent review of the record convinces us that it is beyond "a permissible range of reasonableness." *McClain v. State*, 519 P.2d 811, 813 (Alaska 1974). We must determine this range of reasonableness by examining "the particular facts of the individual case in light of the total range of sentences authorized by the legislature for the particular offense." *State v. Wentz*, 805 P.2d 962, 965 (Alaska 1991) (original emphasis omitted). Both parties recognize that a maximum sentence will ordinarily be justified when the record provides a " 'foundation for characterizing the defendant as the worst type of offender.' " *State v. Wortham*, 537 P.2d at 1120

(*quoting Galaktionoff v. State*, 486 P.2d 919, 924 (Alaska 1971)). Keyser, however, challenges the sentencing court's worst offender finding and argues that his sentence is disproportionately long. In response, the state insists that the sentencing record supports Judge Schulz' worst offender finding and argues that, as a worst offender, Keyser deserves the maximum sentence.

■ To qualify as a "worst offender ... the defendant must be the worst type of offender 'within the group of persons committing the offense in question.' " *Hintz v. State*, 627 P.2d 207, 210 (Alaska 1981) (*quoting Wilson v. State*, 582 P.2d 154, 157 n. 3 (Alaska 1978)). Whether Keyser was properly found a worst offender depends on the specific circumstances surrounding his crime, as well as on Keyser's character and background. *Id.* Of specific relevance in the consideration of Keyser's character and prior background are factors such as prior criminal history, age, military records, employment history, drug or alcohol addiction, presentence report evaluations and predictions, and the possible presence of antisocial tendencies which pose a clear risk to the public. *Id.; see also Moore v. State*, 597 P.2d 975, 976 n. 4 (Alaska 1979); *State v. Wortham*, 537 P.2d at 1120.

■ Here, the sentencing court expressly found that the conduct for which Keyser was convicted was not a particularly aggravated case of first-degree theft by deception. This finding is supported by the record. The amount of money involved in Keyser's theft—$28,680—was only slightly more than the minimum amount necessary for purposes of the first-degree theft statute—$25,000. Nor was there anything unusually aggravated involved in the type of deception Keyser used in committing the theft: he simply submitted a false application for employment with the village of Kake. Officials there evidently did not attempt to verify Keyser's information before deciding to hire him. Because Keyser's conduct was not among the worst in its category, it did not in itself justify an exceptionally severe sentence.

Keyser's character and background are another matter. For purposes of determining whether Keyser's character and background justified classifying him as a worst offender or sentencing him to an exceptionally lengthy term of imprisonment, the sentencing court was fully entitled to consider Keyser's conduct on probation and the additional information that came to light in the updated presentence report. *See Andrew v. State*, 835 P.2d 1251, 1254–55 (Alaska App.1992); *Chrisman v. State*, 789 P.2d 370, 371 (Alaska App.1990).

The totality of the information available upon revocation of Keyser's probation certainly justifies the conclusion that his prospects for rehabilitation were considerably poorer than those of a typical first felony offender and that he posed a continuing danger to the community far greater than was reflected by the isolated crime that led to his conviction.

The sentencing record reveals that Keyser has engaged in a continuous pattern of fraudulent misconduct over a period of approximately ten years. Keyser's crimes have enabled him to obtain substantial amounts of money—in the form of wages, loans, and other monetary compensation—to which he was not entitled. In the process, he has disrupted the civic functions of numerous small communities and has caused financial and personal hardship to countless individuals. And he has persisted in this misconduct, seemingly escalating it, despite being placed on formal probation for his recent conviction of a felony.

These circumstances, in our view, justify the conclusion that Keyser's case is "even more serious—and therefore deserving of even greater punishment—than the case of a typical second felony offender committing a typical offense of the same class." *Chrisman v. State*, 789 P.2d at 371. In fact, despite Keyser's status as a first felony offender, we believe that the extraordinary circumstances of his case could even justify a sentence somewhat beyond the six-year benchmark for exceptionally ag-

gravated first-offense class B felonies.[2] These same circumstances differentiate Keyser's case from other aggravated first-offense, first-degree theft cases in which lower sentences have been imposed and approved.[3]

Our independent review of the record nevertheless convinces us that the sentencing court was clearly mistaken in concluding that Keyser's background and his conduct on probation qualified him for designation as a worst offender for whom the maximum term was necessary—that is, "the worst type of offender 'within the group of persons committing the offense in question.'" *Hintz v. State*, 627 P.2d at 210 (*quoting Wilson v. State*, 582 P.2d at 157 n. 3).

Almost all cases involving worst offender findings based on the seriousness of an offender's background (as distinguished from worst offender findings based on the seriousness of the crime involved in the particular case) have dealt with offenders whose past misconduct, regardless of whether it resulted in formal convictions, clearly established them to be undeterrable and incapable of rehabilitation, that is, offenders "who ... had 'past proven criminal record[s],' ... [or] whose criminal histories had 'establish[ed] an ingrained, compulsive criminal pattern.'" *DeGross v. State*, 816 P.2d 212, 219 (Alaska App.1991) (*quoting Contreras v. State*, 767 P.2d 1169, 1175 (Alaska App.1989), and *Schuenemann v. State*, 781 P.2d 1005, 1009 (Alaska App. 1989)).

We have previously approved extremely severe sentences for first-offense class B felons—even sentences exceeding the single-count maximum of ten years—when an offender's background revealed persistent criminality in the face of prior efforts at deterrence or despite repeated, unsuccessful efforts at rehabilitation. *See, e.g., Kirlin v. State*, 779 P.2d 1251 (Alaska App. 1989). *See also State v. Graybill*, 695 P.2d 725, 731 (Alaska 1985).

On the other hand, we have disapproved maximum sentences for such offenders, despite a pattern of misconduct and psychological evidence indicating potential danger, when the sentencing record contained no meaningful showing that the offender's ability to be deterred had been tested or that past rehabilitative efforts had failed. *See Skrepich v. State*, 740 P.2d at 954–55. *See also DeGross v. State*, 816 P.2d at 218–19. In particular, we have observed the need to avoid giving undue prominence to predictions of danger based on psychological information. *Skrepich v. State*, 740 P.2d at 954–55; *Maal v. State*, 670 P.2d 708, 711–12 (Alaska App.1983).

These cases reflect the law's traditional recognition that the most reliable indicator of future danger is an offender's willingness to reoffend despite previous efforts at deterrence or rehabilitation. *See, e.g., State v. Rastopsoff*, 659 P.2d 630, 640 (Alaska App.1983). Absent a background showing failure in the face of rehabilitative or deterrent measures, predicting future conduct necessarily becomes speculative. *Skrepich v. State*, 740 P.2d at 955.

In the present case, although Keyser has engaged in a prolonged pattern of increasingly serious criminal misconduct and has persisted in offending despite a misdemeanor conviction in Florida in 1987 and his current felony conviction in 1989, Keyser's capacity for deterrence has never been tested. Before his probation was revoked in this case, he had evidently been incarcerated on but one occasion; his incarceration was in connection with the original

---

**2.** *See State v. Jackson*, 776 P.2d 320, 326 (Alaska App.1989) (establishing six years as the benchmark upper limit for an exceptionally aggravated class B felony committed by a first felony offender); *cf. Osterback v. State*, 789 P.2d 1037 (Alaska App.1990) (affirming a sentence of ten years with four years suspended for a first felony offender convicted of a class B felony, although the sentence as a whole somewhat exceeded the *Jackson* six-year benchmark); *Skrepich v. State*, 740 P.2d 950 (Alaska App.1987)

(also concluding that a sentence of ten years with four suspended would be justified for a first-offense class B felon).

**3.** *See, e.g., Karr v. State*, 686 P.2d 1192 (Alaska 1984); *Short v. State*, 676 P.2d 612 (Alaska App. 1984); *Brezenoff v. State*, 658 P.2d 1359 (Alaska App.1983). *Cf. State v. Karnos*, 696 P.2d 685 (Alaska App.1985).

sentencing hearing here, when he received only ninety days in jail, with credit for time served.

Likewise, Keyser is hardly an offender who has " 'run the gamut of judicial tools used for rehabilitation.' " *State v. Graybill*, 695 P.2d at 729 (*quoting* the presentence report prepared in Graybill's case). Keyser's background includes no meaningful history of failed rehabilitative efforts. Neither in the past nor under the conditions of probation included in the original suspended imposition of sentence in this case has Keyser ever been encouraged or required to participate in counseling, treatment, or other forms of rehabilitation. Indeed, in the present case, despite clear warnings in the original presentence report that Keyser was apt to reoffend as a probationer absent a structured and closely supervised program, his original suspended imposition of sentence allowed his release on probation with only token oversight.

Finally, we note that Dr. Caldwell's psychological evaluation of Keyser fails to support the conclusion that Keyser is unamenable to rehabilitation or that he could not be deterred by a sentence less than the maximum term. Nowhere does Caldwell address the issue of Keyser's capacity for deterrence. In pointing out various negative personality traits which suggest "lifelong adjustment problems," and in concluding that Keyser is a poor candidate for "insight oriented individual psychotherapy," Caldwell certainly does indicate that Keyser's rehabilitative prospects are guarded. But Caldwell goes on to recommend that Keyser is "most likely to benefit from close supervision and long term direct monitoring of his behavior and activities in progressively diminishing direct management." Contrary to the state's argument that Caldwell's report shows Keyser to be a "pathological liar" for whom rehabilitation is a lost cause, this statement appears to expressly recognize the existence of treatment methods to which Keyser could be responsive.

## CONCLUSION

Given the absence of significant past deterrent or rehabilitative efforts, and in light of the psychological report's apparent finding that Keyser may be amenable to treatment for the problems underlying his criminal behavior, we hold that the record does not support the sentencing court's finding that Keyser is the type of "intractable offender" who can neither be rehabilitated nor deterred.[4] Having independently reviewed the entire sentencing record, we conclude that the court's imposition of a maximum sentence based on this finding is clearly mistaken. *McClain v. State*, 519 P.2d at 813–14.

The sentence is REVERSED, and this case is REMANDED for resentencing.

---

**4.** In fact, we note that the sentencing court's finding that Keyser is an intractable offender seems somewhat at odds with its separate find- ing emphasizing the importance of specific deterrence as a factor in Keyser's sentence.